No. 64,060

STATE OF KANSAS, *Appellee,* v. CORY GLEN HAMONS, *Appellant.*

(805 P.2d 6)

Opinion filed January 18, 1991.

*Joseph L. Dioszeghy*, of Overland Park, argued the cause and was on the brief for appellant.

*Paul J. Morrison*, district attorney, argued the cause, and *Debra A. Vermillion*, assistant district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

Six, J.: A jury convicted Cory Glen Hamons, appellant, of first-degree murder (K.S.A. 21-3401). Hamons was sentenced to a term of life imprisonment.

Five separate issues are asserted as error in this appeal. We conclude that each presents a valid question for resolution. We note that the initial issue is one of first impression in Kansas.

The issues are: (1) whether an accused must be told that he or she has been formally charged before a post-complaint Sixth Amendment waiver will be valid; (2) whether the trial court erred in excluding evidence that other persons may have committed the murder absent direct evidence linking them to the crime; (3) whether the Sixth Amendment confrontation right extends to an ex parte material witness bond hearing regarding a State witness' reluctance to honor a subpoena; (4) whether the trial court erred in its jury instruction on the element of premeditation; and (5) whether the trial court erred in refusing to instruct on the lesser included offense of voluntary manslaughter.

We find no prejudicial error and affirm. We have jurisdiction of this direct appeal under K.S.A. 1989 Supp. 22-3601(b)(1).

## Facts

Julie Solaberry, a single parent, lived with her two-year-old daughter, Andrea. On October 12, 1988, Julie's body was found in her apartment by her mother, Shirley Solaberry. Julie had been stabbed to death. Andrea, although apparently frightened, was physically unharmed. Andrea appeared to have been hiding

in her bedroom until she recognized her grandmother. Shirley had last spoken with Julie at 9:00 p.m. on October 11, 1988.

Police, medical, and crime lab personnel arrived shortly after discovery of the body. Julie had sustained at least 163 cuts and stab wounds. Many of these wounds were described as "defense wounds"—wounds inflicted on Julie's arms while she was attempting to defend herself.

Julie's body was found lying just inside her bedroom walk-in closet. A bloody fingerprint was found on the back wall of the closet.

Julie's sister, Theresa Solaberry, had been Hamons' girlfriend for about two and one-half years before Julie's death. On the afternoon of October 12, 1988, before Julie's body had been discovered, Theresa stopped by Hamons' place of employment. Theresa noticed some recent scratch marks on Hamons' left arm. Later that day, she learned that Julie was dead. That evening, Theresa called Hamons and asked him to come over to her parents' house to be with her. While Hamons was there, Shirley returned with Andrea. When Andrea saw Hamons, she appeared to be afraid and hid between her aunt and grandmother. Hamons subsequently left. Theresa called Hamons later that evening and asked him to return. Hamons declined but promised to call Theresa the next day. He did not call. Theresa felt that he wanted to avoid her.

Theresa believed that Hamons knew something about Julie's death. Her suspicions were based upon the cuts on his arm, Andrea's reaction to Hamons, and Hamons' behavior toward her (Theresa). Theresa told the Metro Squad, which had been activated to investigate Julie's death, that she believed Hamons was a possible suspect.

The Metro Squad, acting on Theresa's information, began investigating Hamons. The bloody fingerprint on Julie's closet wall was identified as a print of Hamons' left middle finger.

Hamons lived with his father. Hamons' father told the police that his son owned a butterfly knife. Hamons' employer testified that Hamons had a butterfly knife that he used regularly at work and that he had seen Hamons with the butterfly knife on October 10, 1988.

On October 14, 1988, the police went to Hamons' place of employment and asked Hamons to accompany them to the police department for questioning. Hamons did so voluntarily. When he removed his coat as requested, an officer noticed the cuts on Hamons' left arm. Hamons was not placed under arrest at that time.

After arriving at the police department, an officer noticed what appeared to be blood on Hamons' tennis shoes. The shoes were sent to the laboratory for testing. Tests indicated that the blood contained the same genetic factors as Julie's blood and that only .086% of the population would have the same genetic factors.

Hamons was interviewed at the police department. Before questioning began, he was advised of his *Miranda* rights both orally and in writing. He signed a written waiver of rights.

Hamons told the detectives that he went to Julie's apartment at about 2:00 a.m. on October 12, 1988, to see if she wanted to buy some cocaine. Julie answered the door. He was in the kitchen and living room areas of her apartment for five to ten minutes. Julie did not have any money for cocaine, so Hamons left the apartment, returned home, and went to bed. He told the detectives that the scratches on his arms occurred while fixing the gearshift on his car. Hamons denied owning a butterfly knife after he went into the Army (November 1987).

At trial, the State presented the testimony of Rhonda Wray, who lived in Julie's apartment building. Wray testified that, during the month prior to Julie's death, she frequently saw Hamons between 6:00 and 6:45 a.m., coming down the steps and walking past Wray's sliding glass door. She saw Hamons walk past her door the morning Julie's body was discovered. On cross-examination, Wray stated that she did not see where Hamons came from nor where he went. Wray also stated she saw Julie and Hamons kissing while sitting on the hood of a car.

James Bradshaw, a jail mate of Hamons at the Johnson County Jail, testified that Hamons had admitted killing Julie. According to Bradshaw's testimony, Hamons and Julie were having a sexual affair. The night or early morning that Julie was killed, Hamons and Julie were "high" on cocaine. Julie told Hamons if he did not give her more cocaine, she would tell her sister, Theresa,

about the affair. Hamons told Bradshaw he just "went off" and stabbed Julie with the butterfly knife.

Hamons' testimony at trial differed substantially from his October 14, 1988, pretrial statement. At trial, Hamons stated that he arrived at Julie's apartment at approximately 2:00 a.m. and that the door was partially open. When no one answered his knock, he entered the apartment, called Julie's name, and found her in the closet. He testified that he shook her and checked her neck for a pulse. Julie was dead. He explained the bloody fingerprint by stating he touched the wall while checking to see if Julie was alive. He did not call the police because he had cocaine on him. He "freaked out." He was scared and did not want to get involved.

Hamons further testified that the next morning, he noticed blood on his shoes. He removed the shoestrings, washed them in the washing machine, and wiped off his shoes. Hamons said he lied to the police because he felt bad and was ashamed about not calling the police when he discovered the body. Hamons also admitted that he had a butterfly knife but claimed that he last had seen the knife on October 10, 1988. He explained that the scratches on his arm resulted from working on his car and from "messing around" with a razor blade.

### The Motion to Suppress Hamons' Pretrial Statement

Hamons moved to suppress his October 14, 1988, pretrial statement. The complaint charging Hamons with first-degree premeditated murder was filed by the district attorney on October 14, 1988, at 10:04 a.m., before Hamons' interview at the Shawnee Police Department began. Approximately one minute into the interview, at 10:45 a.m., Hamons was advised of his *Miranda* rights. He also signed a waiver.

Hamons argues that his waiver was neither voluntary nor made with full knowledge of all relevant facts. Hamons was never advised that he had been charged with first-degree murder. The motion alleged that Detectives Walters and Langor, the detectives who interviewed Hamons, knew that charges had been filed when they commenced the interview.

At the hearing on the motion to suppress, Detective Walters testified that he did not learn of the charge until near the end of the interview, after he had left the room to locate a camera.

Detective Langor did not learn of the charge until the interview was completed.

The trial court found that Hamons' statement was given freely, voluntarily, and intelligently after he had been advised of his constitutional rights. The trial court reasoned that a requirement of continued contact during interrogation between investigators and the district attorney to determine the exact instant a charge is filed would be unreasonable. We agree.

The Fifth Amendment right against self-incrimination requires that suspects be accorded the assistance of counsel during custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 469, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

The Sixth Amendment right to counsel arises when judicial proceedings have been initiated against a suspect "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972); see *State v. Norris,* 244 Kan. 326, 331-33, 768 P.2d 296 (1989). A defendant's statement elicited without the presence or aid of a lawyer after attachment of Sixth Amendment protections, may not be used against the defendant at trial unless the State can show that the accused knowingly, voluntarily, and intelligently waived the right to counsel. See *Brewer v. Williams,* 430 U.S. 387, 404-05, 51 L. Ed. 2d 424, 97 S. Ct. 1232, *reh. denied* 431 U.S. 925 (1977).

In *Patterson v. Illinois,* 487 U.S. 285, 299-300, 101 L. Ed. 2d 261, 108 S. Ct. 2389 (1988), the United States Supreme Court held: "So long as the accused is made aware of the 'dangers and disadvantages of self-representation' during post-indictment questioning, by use of *Miranda* warnings, his wavier of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.' "

Because the defendant in *Patterson* was informed that he had been formally charged, the United States Supreme Court did not address the first impression question presented to this court in the case at bar: Whether an accused must be told that he or she has been formally charged before a post-complaint Sixth Amendment waiver will be valid. See *Patterson,* 487 U.S. at 295, n.8.

Hamons relies on *United States v. Mohabir,* 624 F.2d 1140 (2d Cir. 1980), and *Carvey v. LeFevre,* 611 F.2d 19 (2d Cir.

1979), *cert. denied* 446 U.S. 921 (1980). In those cases, the Second Circuit Court of Appeals held that an accused must be informed of the indictment before a post-indictment Sixth Amendment right to counsel waiver would be valid. The court in *Mohabir* and *Carvey* reasoned that waiver of the Sixth Amendment right to counsel required a "higher standard" than Fifth Amendment *Miranda* warnings. 624 F.2d at 1148; 611 F.2d at 22.

The United States Supreme Court in *Patterson* expressly rejected the Second Circuit's rationale in *Mohabir*. 487 U.S. at 295, n.8.

In *Riddick v. Edmiston,* 894 F.2d 586 (3d Cir. 1990), the Third Circuit Court of Appeals addressed a claim similar to the one Hamons advances in this appeal. The court in *Riddick* rejected the reasoning of *Mohabir* and *Carvey,* observing that the United States Supreme Court had concluded in *Patterson* that there is no analytical distinction between the validity of a Fifth Amendment waiver and a Sixth Amendment waiver. 894 F.2d at 587-88. In *Riddick,* defendant validly waived his Sixth Amendment right to counsel when he was given *Miranda* warnings without being told that he had already been indicted for murder. 894 F.2d at 588.

In *Moran v. Burbine,* 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986), the United States Supreme Court commented, "[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or to stand by his rights." 475 U.S. at 422.

In the case at bar, the detectives testified, and the trial court found, that they did not know Hamons had been charged until the end, or near the end, of the interview. There is no indication that the detectives intended to deceive Hamons.

The *Miranda* warnings advised Hamons of his right to remain silent and of his right to counsel. Hamons was informed that any statement he made could be used against him and of the consequences of waiving his right to counsel. We hold that Hamons validly waived his Sixth Amendment right to counsel after he was given *Miranda* warnings but before he was told that he had already been charged with murder.

The trial court did not err in overruling Hamons' motion to suppress his pretrial statement to police.

## The Exclusion of Evidence That Other Persons May Have Committed The Murder

The State filed a motion in limine to exclude evidence that someone other than Hamons may have killed Julie Solaberry. The State asserted that, in the "absence of direct evidence linking such third party with the crime," third-party evidence was improper.

At the pretrial hearing on the motion, Hamons' counsel provided the court with three examples of suspicion-casting evidence. Only one example is pertinent to Hamons' appeal.

On the afternoon of October 11, 1988, the day before her murder, Julie made a child abuse complaint to the police against her neighbor Becky Parker. The police came to Parker's apartment on the day of the complaint and questioned her regarding the allegations of child abuse. Parker was angry about the complaint.

Hamons' counsel stated that Angela Anthony would testify that Nancy Hickman, a neighbor and friend of Parker's, called Anthony on October 12, 1988, and said: "Julie Solaberry is sticking her nose into people's business. She is calling the SRS and making complaints about child abuse. She is going to get herself killed one of these days."

The trial court ruled that (1) any positive ruling in advance of trial might be impossible; and (2) evidence that another person may have committed the crime was not admissible in the absence of direct evidence linking such third party with the crime.

At trial, Hamons again proffered Anthony's testimony. Hamons' counsel stated that, although Anthony had vacillated as to the precise time, she would testify that on October 12, 1988, at approximately 12:00 p.m., prior to Julie's body being discovered, Hickman telephoned Anthony. Counsel stated that Anthony would testify that Hickman told Anthony that Hickman and Parker went to Julie's apartment on the night of October 11, 1988, (the night Julie was killed) and had a confrontation or "something of an angry encounter" with Julie. Anthony would further testify that she had called the Metro Squad and informed them of this conversation.

The trial court reserved ruling on the admission of Anthony's testimony until after Hickman and Parker had testified.

Hickman testified that she and Parker did not go to Julie's apartment on October 11, 1988. Hickman admitted calling Anthony on October 12, 1988, at about noon. However, Hickman denied telling Anthony that she and Parker had gone to Julie's apartment and had had a confrontation on the evening of October 11, 1988. Parker testified that she had not talked to Julie for a period of three months before Julie died.

Following Hickman's and Parker's testimony, Hamons again proffered substantially the same testimony of Anthony. He also proffered the testimony of the police officers who investigated the child abuse complaint.

The State took issue with Hamons' version of Anthony's testimony. The State asserted that "at best" Anthony would testify that she had thought Hickman told her that Hickman and Parker talked to Julie after Julie called the police and that Anthony would not remember anything about a confrontation.

Anthony's testimony was excluded. The trial court found that the State's case rested on direct evidence connecting Hamons to Julie's murder. The trial court reasoned that: (1) the sole purpose of Anthony's testimony would be to show motive of someone else to commit the crime absent evidence to connect Hickman and Parker to the crime; (2) Hickman was under oath at trial but not when she talked to Anthony; and (3) the evidence, if allowed, was not compelling or persuasive.

Hamons argues that the exclusion of this evidence was an abuse of discretion and violated his right to call witnesses in his own defense. We agree.

In excluding Anthony's testimony, the trial court relied on *State v. Calvert,* 211 Kan. 174, 505 P.2d 1110 (1973); *State v. Henderson,* 205 Kan. 231, 468 P.2d 136 (1970); *State v. Potts,* 205 Kan. 42, 468 P.2d 74 (1970); and *State v. Neff,* 169 Kan. 116, 218 P.2d 248, *cert. denied* 340 U.S. 866 (1950).

Hamons argues that the State's evidence is not direct, but circumstantial. He distinguishes *Calvert, Henderson,* and *Potts,* all of which involved the testimony of eyewitnesses who saw the various defendants commit the crimes.

He also cites *State v. Brown*, 230 Kan. 499, 638 P.2d 912 (1982). The State's case against Brown was based exclusively on eyewitness testimony. Brown proffered evidence of another robbery in Wichita on the same evening as the robbery for which Brown was charged. Brown wanted to produce the testimony of a sales clerk concerning the other robbery and the description of that robber, whose physical characteristics were similar to Brown's.

We held that where the State's case is built on direct evidence, circumstantial evidence that someone other than the defendant committed the crime is irrelevant in the absence of other evidence to connect such third person to the crime. 230 Kan. at 499-500.

Circumstantial evidence tends to prove a fact in issue by proving other events or circumstances which afford a basis for a reasonable inference by the jury of the occurrence of the fact in issue. *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 550, 431 P.2d 518 (1967).

In the case at bar, the State relied on Hamons' fingerprint, Julie's blood on Hamons' shoes, and testimony of Wray placing Hamons at the apartment complex on the morning of the murder. These facts prove that Hamons was at the murder scene after Julie was dead. An inference is necessary that Hamons committed the murder. This and other circumstantial evidence formed the major characterization of the State's case.

The proffered evidence indicated a motive and the opportunity for Hickman and Parker to commit the murder.

We have found no abuse of discretion in the exclusion of similar proffered testimony where the State's case was based either exclusively, or almost entirely, upon direct evidence for a conviction. *State v. Brown*, 230 Kan. at 500 (eyewitness identification testimony); *State v. Henderson*, 205 Kan. at 239 (eyewitness identification testimony); *State v. Potts*, 205 Kan. at 44 (eyewitness identification testimony); *State v. Neff*, 169 Kan. at 123 (a confession).

No eyewitness testified that Hamons killed Julie. Hamons denied his guilt.

The State relied, in part, on the direct evidence of Hamons' confession to Bradshaw, his jail mate.

Anthony's testimony, as proffered by Hamons, placed Hickman and Parker at Julie's apartment on the evening before Julie was killed. Timely placement at the murder scene together with testimony about an "angry encounter" was linked with an inference of a threat that occurred on the day the victim's body was discovered ("[Julie] is going to get herself killed one of these days"). Because the State relied heavily on circumstantial evidence, the trial court abused its discretion in excluding Anthony's testimony. *State v. Scott,* 117 Kan. 303, 315, 235 Pac. 380 (1924).

However, the error was not prejudicial. A review of the record demonstrates that the State established an overwhelming case against Hamons. The exclusion of Anthony's testimony was harmless error beyond a reasonable doubt. See *State v. White,* 246 Kan. 28, 37, 485 P.2d 950, *modified* 246 Kan. 393, 789 P.2d 1175 (1990).

### The Ex Parte Material Witness Bond Hearing

The State filed a K.S.A. 22-2805 affidavit stating that Wray was a material witness. She would testify that Hamons was seen leaving the victim's home at or near the time of the murder. The affidavit stated that Wray had been served with a subpoena but that she had informed the district attorney's office that she would not appear. The State asked the trial court to require a bond to assure her attendance.

The trial court specifically found that the hearing initiated by the State's affidavit was for the limited purpose of assuring attendance of a material witness at trial and did not require the appearance of Hamons or his counsel. The trial judge asked Wray if she would come to trial and testify truthfully. Wray stated that she would. The trial judge told her that if she violated the subpoena, she would be arrested and incarcerated. No bond was required.

Hamons argues that the bond hearing violated his Sixth Amendment and statutory rights of confrontation. Hamons cites K.S.A. 22-3405(1), which provides in part: "The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law."

The right of confrontation under the Kansas and United States Constitutions includes the right of the accused to a face-to-face confrontation while the accuser is testifying against the accused. *State v. Chisholm,* 245 Kan. 145, 149-50, 777 P.2d 753 (1989). A primary interest secured by the confrontation clause of the Sixth Amendment is the right of cross-examination. *Kentucky v. Stincer,* 482 U.S. 730, 736, 96 L. Ed. 2d 631, 107 S. Ct. 2658 (1987).

The record of the bond hearing indicates that no evidence or testimony regarding any aspect of the crime was discussed. The only issues at the hearing were whether Wray would honor the subpoena and whether she would be required to post a bond. The district attorney was not allowed to examine Wray. Hamons was afforded the opportunity at trial to cross-examine Wray.

We reject Hamons' contention. His Sixth Amendment right to confrontation was not violated. We find no error in the conduct of the bond hearing.

### Jury Instructions

#### (A) Premeditation

Hamons contends that the trial court erred in its instruction on premeditation. The trial court instructed the jury as follows:

" 'Deliberately and with premeditation' means to have thought over the matter beforehand. However, to constitute deliberation and premeditation, no particular time need intervene between formation of the intention and the doing of the act. It is sufficient if they actually existed, with a full appreciation of the result likely to follow from the act, at the time the act was committed, however short the time of their existence may have been."

Hamons argues that this instruction unduly emphasized and endorsed the State's theory of deliberation and premeditation.

A trial court has discretion in giving instructions to the jury. On appeal, the instructions should be approved if, after being considered in their entirety, they properly and fairly state the law as applied to the facts. *State v. Graham,* 244 Kan. 194, 206, 768 P.2d 259 (1989).

The premeditation instruction in the case at bar is almost identical to the instruction we approved in *State v. Broadus,* 206 Kan. 766, 768-69, 481 P.2d 1006 (1971).

The autopsy revealed 163 stab wounds. The forensic pathologist estimated that it would take between 10 and 15 minutes to inflict all of these wounds.

The premeditation instruction given by the trial court properly states the law as applied to the facts of the instant case.

(B) Voluntary Manslaughter

Hamons requested a lesser included offense instruction on voluntary manslaughter. K.S.A. 21-3107(3). The trial court rejected the request and instructed only on first- and second-degree murder.

The evidence of a lesser included offense need not be strong or extensive as long as it presents circumstances from which a lesser offense might reasonably be inferred. Unsupported testimony alone, if tending to establish such inferior degree, is sufficient to require the court to instruct on a lesser included offense. *State v. Guebara,* 236 Kan. 791, 795, 696 P.2d 381 (1985).

"Where a person is charged with murder in the first degree (21-3401), the crimes of murder in the second degree (21-3402), voluntary manslaughter (21-3403), and involuntary manslaughter (21-3404) are considered to be lesser degrees of the crime charged." *State v. Seelke,* 221 Kan. 672, 675, 561 P.2d 869 (1977). K.S.A. 21-3403 defines voluntary manslaughter as "the unlawful killing of a human being, without malice, which is done intentionally upon a sudden quarrel or in the heat of passion."

In order to be entitled to a reduced charge of voluntary manslaughter because the defendant acted in the heat of passion, there must be provocation sufficient to cause an ordinary person to lose control of his or her actions and reason. This is an objective, not a subjective, test. *Guebara,* 236 Kan. at 796. Mere words or gestures do not constitute adequate provocation. 236 Kan. at 797.

Hamons contends that the testimony of Bradshaw provided evidence sufficient to require an instruction on voluntary manslaughter.

Bradshaw testified that Hamons "went off" and stabbed Julie when she threatened to tell her sister that Hamons and Julie were having a sexual affair. There was no evidence of provocation other than Julie's threats. The State argues that this evidence is insufficient to establish provocation. The State's argument is persuasive. Mere words are insufficient provocation.

We also observe that Hamons claimed someone else murdered Julie before he arrived at her apartment.

There was insufficient evidence to warrant an instruction on the lesser included offense of voluntary manslaughter.

Affirmed.