36 F.3d 1105
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Cory Glen HAMONS, Petitioner-Appellant,
v.
David R. McKUNE; Attorney General of Kansas, Respondents-Appellees.
 No. 93-3236.
 United States Court of Appeals, Tenth Circuit.
 Sept. 15, 1994.
 
 1
 Before BRORBY and EBEL, Circuit Judges, and KANE,** District Judge.
 
 ORDER AND JUDGMENT[1]
 
 2
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 3
 Petitioner Cory Hamons appeals the district court's order of May 28, 1993, denying his request for habeas corpus relief pursuant to 28 U.S.C. 2254, as well as the court's order of July 2, 1993, denying petitioner's motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e). The only issue petitioner raised in his habeas petition was whether the state court denied him due process and violated his Sixth Amendment right to call witnesses in his own behalf by excluding certain evidence at petitioner's trial.[2] The district court concluded that any error in excluding the evidence at issue was harmless. We affirm.
 
 
 4
 Petitioner was convicted of murdering Julie Solaberry, who was stabbed approximately 163 times sometime between 9:00 p.m. on October 11, 1988, when Solaberry's mother last talked to her, and 5:00 p.m. on October 12, 1988, when Solaberry's mother found her body lying just inside a large walk-in closet in Solaberry's apartment. Solaberry's two-year-old daughter apparently was in the apartment during the brutal attack, but was unharmed when Solaberry's mother found her.
 
 
 5
 Petitioner had been dating Solaberry's sister for approximately three years at the time of Solaberry's death. The sister became suspicious that petitioner had some involvement in Solaberry's death and reported her suspicions to the police. Petitioner was arrested for the murder after a bloody fingerprint on the back wall of Solaberry's walk-in closet was identified as petitioner's. Subsequently, blood on petitioner's tennis shoes was found to contain the same genetic factors as Solaberry's blood. Only 0.086% of the population would have the same genetic factors in its blood. A neighbor also identified petitioner as the man she saw walking across her patio in the early hours of October 12.
 
 
 6
 Petitioner initially told the police that he went to Solaberry's apartment at approximately 2:00 a.m. on October 12 to see if Solaberry wanted to buy some cocaine. Petitioner related that Solaberry let him into the apartment and that he remained in her kitchen and living room for five or ten minutes. Solaberry did not have any money for cocaine, so petitioner left and went home to bed.
 
 
 7
 At trial, petitioner told a different story. He said that when he arrived at Solaberry's apartment, he found her door unlocked and a light on in the living room. Petitioner entered the apartment, calling Solaberry's name. When Solaberry did not reply, petitioner walked through the apartment toward Solaberry's bedroom. A closet light in the bedroom drew petitioner's attention, and when he got closer, he saw Solaberry's bloody body lying in the closet. Petitioner said he stepped into the closet, straddling Solaberry's body with his feet, and bent over her to see if she was alive. Petitioner shook Solaberry and called her name. When Solaberry did not respond, petitioner put his hand on her neck to take her pulse.
 
 
 8
 Upon discovering that Solaberry was dead, petitioner testified that he panicked and, in his panic, stumbled while standing up and touched the back wall of the closet with his bloody hand. Petitioner immediately left the apartment. Petitioner testified that he did not notify the police of his discovery because Solaberry was already dead and petitioner was carrying drugs and did not want to get involved.
 
 
 9
 Prior to trial, the prosecution filed a motion in limine seeking to prevent petitioner from "presenting evidence that another party instead of himself committed the crime in which he is charged in [the] absence of direct evidence linking [the] third party with the crime." Tr. of Proceedings on Pretrial Mots. at 59. In response to the motion, petitioner's counsel gave the court several examples of evidence he intended to introduce to suggest that someone other than petitioner may have had the opportunity and a motive to kill Solaberry. Only two of these examples are pertinent here.
 
 
 10
 [1.] The afternoon of the 11th of October, 1988, Miss Solaberry made a complaint to the police about her neighbor living directly across the hallway, Becky Parker. The complaint was in the nature that Ms. Parker was abusing her, Miss Parker's, child. The police were summoned to the apartment at 5:24 on the 11th.
 
 
 11
 ... Two officers from Shawnee, Officer Hines and one of the other ones that I have subpoenaed, they talked to Miss Solaberry. They talked to Becky Parker, questioned Miss Parker. She was extremely agitated and angry about this complaint. She lives directly across from Miss Solaberry and this predates Ms. Solaberry's death by a matter of hours.
 
 
 12
 [2.] ... Woman by the name of Nancy Hickman, who's another neighbor of the deceased, the day, the very day that Julie is found, but prior to her discovery, calls a woman by the name of Angela Anthony and says, "Julie Solaberry is sticking her nose into people's business. She is calling the SRS and making complaints about child abuse. She is going to get herself killed one of these days." That is the very day, and she is already lying dead, the very day one of her neighbor's [sic] makes that statement.
 
 
 13
 Id. at 64-65, 70-71. The trial court deferred ruling on the prosecution's motion, but cautioned petitioner's counsel that, while he would not be precluded from presenting evidence that other people were in Solaberry's apartment the night of her murder, he would be precluded from asking witnesses if they hated Solaberry or had threatened her, absent some direct evidence linking the witnesses to the murder scene.
 
 
 14
 At trial, after the prosecution rested, petitioner's counsel asked the court whether he would be able to present testimony from Angela Anthony to the effect that
 
 
 15
 on October 12th of 1988 at about noon, prior to the body being discovered, the neighbor of Julie Solaberry, one of the neighbors, Nancy Hickman, called her on the telephone and not only talked in general about the bad blood that existed between Nancy and Becky Parker, the other neighbor across from Julie, and Julie, those two versus Julie, but also very specifically told her that on the night that Julie was killed, she, Nancy Hickman, and Becky Parker went to Julie Solaberry's apartment and had a confrontation with her and that this stemmed from Julie Solaberry calling the police and complaining to the police that Becky Parker, the neighbor right across the breezeway, was abusing her child.
 
 
 16
 Trial Tr., Vol. III at 174. The trial court ruled that counsel could call Hickman and Parker as witnesses and ask them if they had been at Solaberry's apartment the night of her murder, but reserved ruling on whether counsel would then be able to call Anthony as a witness to impeach their credibility in the event that Hickman and Parker denied being in Solaberry's apartment that night.
 
 
 17
 When called to the stand, Hickman testified that at the time of Solaberry's death, she and Solaberry were not on speaking terms, though they had once been friends. Hickman said the last time she was in Solaberry's apartment was two or three months before Solaberry's death. Though she admitted calling Anthony around noon on October 12, she denied telling Anthony that on the night of October 11, she and Parker went to Solaberry's apartment and had a confrontation with her.
 
 
 18
 Parker, in turn, testified that she had not been particular friends with Solaberry and, at the time of Solaberry's death, she and Solaberry "were sort of on the outs with each other." Id. at 231. Parker said she had not spoken with Solaberry in about three months prior to her death, and denied going to Solaberry's apartment with Hickman on the night of October 11 and having either a confrontation or a fight with Solaberry.
 
 
 19
 After Hickman and Parker testified, petitioner's counsel again sought to introduce the testimony of Anthony, as well as the officers who investigated Solaberry's child abuse complaint. Counsel made another offer of proof, in which he admitted that Anthony could not be specific about what time on the evening of October 11 the confrontation between Hickman, Parker and Solaberry allegedly occurred. Counsel also informed the court that as a result of her conversation with Hickman on October 12, Anthony called the police and "very specifically asked them to follow up on that." Id., Vol. IV at 8. When the court asked whether the police followed up on Anthony's telephone call, counsel said that no one "ha[d] ever gone back and talked to those people about any of this." Id. The prosecution took issue with counsel's offer of proof, and said that Anthony "would testify at best that she thinks Nancy Hickman told her that she and Rebecca Parker talked to Julie Solaberry after the police were called. That she is not going to remember anything about a confrontation or a fight, and not testify to that." Id. at 7.
 
 
 20
 After listening to the offers of proof, the trial court excluded the testimony of Anthony and the officers that investigated Solaberry's child abuse complaint. The court noted that the prosecution's case relied on direct evidence connecting petitioner to Solaberry's murder and concluded that under Kansas law, when the prosecution relies on direct, rather than circumstantial, evidence to convict, "[e]vidence offered by the defendant to indicate a possible motive of someone other than the defendant to commit the crime is irrelevant absent other evidence to connect such third party with the crime." Id. at 11.
 
 
 21
 The court then considered the purpose of offering Anthony's testimony, which it found was to impeach the credibility of Hickman and Parker. The court noted that both witnesses had testified to other matters that were favorable to the defense, and that the only portion of their testimony petitioner sought to contradict was their denial of a confrontation with Solaberry on the night she was murdered. Thus, the court reasoned, the sole purpose of Anthony's testimony was to show that someone else had a motive to kill Solaberry. Absent other evidence linking Hickman or Parker to the crime, however, the court said such evidence was not admissible.
 
 
 22
 As additional support for its ruling, the court noted that Hickman was under oath when she denied telling Anthony about a confrontation with Solaberry, but she was not under oath when she allegedly told Anthony about the incident. Finally, the court found that the evidence, if admitted, would not be compelling in favor of petitioner because "[i]t would be almost ludicrous to believe that a person who has just committed a crime would the next day before the victim has been found volunteer to call an acquaintance and tell her, 'I had a big fight. I went over there last night. I was mad at her. I went over there and I confronted her,' knowing that the victim is lying in a pool of blood across the hall." Id. at 19-20.
 
 
 23
 On direct appeal, the Kansas Supreme Court found that the trial court abused its discretion and violated petitioner's "right to call witnesses in his own defense" by excluding the proffered testimony. State v. Hamons, 805 P.2d 6, 13 (Kan.1991). Contrary to the trial court's characterization of the evidence, the Kansas Supreme Court determined that "the State relied heavily on circumstantial evidence" to convict petitioner. Id. Therefore, the trial court abused its discretion by excluding Anthony's testimony based on Kansas cases holding that "where the State's case is built on direct evidence, circumstantial evidence that someone other than the defendant committed the crime is irrelevant in the absence of other evidence to connect such third person to the crime." Id. The court further concluded, however, that "[t]he exclusion of Anthony's testimony was harmless error beyond a reasonable doubt" in light of the "overwhelming case against Hamons." Id. at 14.
 
 
 24
 In denying petitioner's request for habeas relief, the district court did not specifically discuss whether the exclusion of the evidence at issue rose to the level of constitutional error.[3] Rather, the district court presumed the error was of constitutional magnitude and then considered whether the error was harmless under the standard enunciated in Chapman v. California, 386 U.S. 18 (1967). Pursuant to Chapman, the state bears the burden of proving "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. at 24. Like the Kansas Supreme Court, the district court concluded that the error here was harmless beyond a reasonable doubt in light of the "insurmountable" evidence against petitioner. R., Vol. I, Doc. 11 at 5-6.
 
 
 25
 Assuming, arguendo, that the trial court committed constitutional error when it excluded the evidence at issue, we agree that the error was harmless. The Supreme Court has recently ruled that the Chapman standard of harmless error does not apply to collateral review of constitutional error. Brecht v. Abrahamson, 113 S.Ct. 1710, 1721-22 (1993). Rather, for those types of error that are amenable to a harmless error analysis,[4] the more relaxed standard discussed in Kotteakos v. United States, 328 U.S. 750 (1946), should apply on collateral review. Brecht, 113 S.Ct. at 1722.
 
 
 26
 The test under Kotteakos is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice."[5]
 
 
 27
 Id. (citation omitted).
 
 
 28
 In applying this standard, we are mindful of the Court's warning in Kotteakos that "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U.S. at 765. We must consider what the error meant to the jury, "not singled out and standing alone, but in relation to all else that happened." Id. at 764. Thus, we must consider the excluded evidence "in light of the record as a whole." Brecht, 113 S.Ct. at 1722.
 
 
 29
 The evidence against petitioner was substantial. In addition to that discussed above, the state adduced other evidence that was damaging to petitioner. For instance, Solaberry's child, with whom petitioner was familiar, acted shy and afraid when she saw petitioner in her grandmother's home the night Solaberry's body was discovered. In contrast, the child's grandmother testified, during the time between when Solaberry's body was found and the time she and the child saw petitioner, the child had been friendly with the police and other strangers whom she met.
 
 
 30
 James Bradshaw, a fellow inmate of petitioner's in the county jail, testified that he and petitioner discussed Solaberry's murder and petitioner admitted that he killed her. Bradshaw testified that petitioner told him he had been having an affair with Solaberry and that on the night in question, petitioner and Solaberry got high on cocaine. When Solaberry threatened to tell her sister of the affair if petitioner did not give her more cocaine, petitioner said he just "went off" and stabbed her with his knife. Trial Tr., Vol. II at 189. Bradshaw's testimony was corroborated in part by that of Rhonda Wray, who lived in Solaberry's apartment building, and testified that for several months she had frequently seen petitioner walking across her patio in the early morning hours, including on the morning of October 12.
 
 
 31
 The evidence also showed that petitioner carried a butterfly knife and was last seen with it on October 10. When questioned by police, however, petitioner denied having owned a butterfly knife since the previous fall. Petitioner never produced his knife after Solaberry's body was found, and the police never recovered the murder weapon. Furthermore, the evidence concerning the blood on petitioner's shoes and his fingerprint on the wall of Solaberry's closet was more consistent with petitioner's presence in the closet at the time Solaberry was killed than with his presence in the closet only after Solaberry was already dead.
 
 
 32
 Against this factual backdrop, we consider the proffered testimony that the trial court excluded. The proffered testimony was not directly exculpatory. At most, the excluded testimony would have placed two angry women, both of whom testified that they had not been on speaking terms with Solaberry for several months, in Solaberry's apartment sometime on the night she was killed. At least one of the women was still angry the next day, when she called her friend Angela Anthony and told her that Solaberry had been sticking her nose into other people's business and had better watch out or she could get killed someday. Absolutely no other evidence linked these two women to Solaberry's death.
 
 
 33
 In light of the overwhelming evidence pointing to petitioner's guilt, we have no "grave doubt" as to whether the trial court's exclusion of the proffered testimony had a "substantial and injurious effect or influence in determining the jury's verdict." Kotteakos, 328 U.S. at 776; Brecht, 113 S.Ct. at 1727. Like the Kansas Supreme Court and the district court, both of whom analyzed the evidence under the more stringent Chapman harmless error standard, we conclude that the error in excluding the proffered testimony was harmless.
 
 
 34
 The judgment of the United States District Court for the District of Kansas is AFFIRMED.
 
 
 35
 The mandate shall issue forthwith.
 
 
 
 **
 Honorable John L. Kane, Jr., Senior District Judge, United States District Court for the District of Colorado, sitting by designation
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 In his Rule 59(e) motion, petitioner tried to raise new claims of trial error, which, he asserted, "in culmination with the totality of the trial circumstances are such that Petitioner was denied a fair trial." R., Vol. I, Doc. 13 at 13. In ruling on the motion, the district court noted that the only issue properly before it was whether the exclusion of evidence violated petitioner's "constitutional right to present a defense." R., Vol. I, Doc. 14 at 1-2. The court, therefore, did not address any of the new claims of error raised by petitioner
 Petitioner seeks to raise the same additional points of error on appeal. Because petitioner did not raise these issues properly in the district court, we will not address them on appeal. Steele v. Young, 11 F.3d 1518, 1520 n. 1 (10th Cir.1993) (refusing to consider on appeal issues that were raised for first time in habeas petitioner's Rule 59(e) motion).
 
 
 [3]
 The erroneous exclusion of a defendant's evidence may violate both the defendant's Sixth Amendment and due process rights. See U.S. Const. amend. VI; Washington v. Texas, 388 U.S. 14, 19 (1967)
 
 
 [4]
 The type of constitutional error that is amenable to a harmless error analysis is trial error, i.e., error that " 'occur[s] during the presentation of the case to the jury.' " Brecht, 113 S.Ct. at 1717 (quoting Arizona v. Fulminante, 499 U.S. 279, 307 (1991)) (alteration in original). "At the other end of the spectrum of constitutional errors lie 'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards.' " Id. (quoting Fulminante, 499 U.S. at 309). The error at issue here is of the trial type and, therefore, amenable to a harmless error analysis. See United States ex rel. Ashford v. Director, Ill. Dep't of Corrections, 871 F.2d 680, 688 (7th Cir.1989) (applying harmless error analysis to constitutional error arising from exclusion of evidence defendant sought to admit); cf. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) (holding that Confrontation Clause errors are subject to Chapman harmless error analysis)
 
 
 [5]
 This language in Brecht appears to shift to the habeas petitioner the burden of proof on harmless error that both Kotteakos and Chapman previously placed on the state. 328 U.S. at 760; 386 U.S. at 24, 26. As a result, the circuit courts are split over who bears the burden of establishing whether a constitutional error is harmless under the Kotteakos standard. Compare O'Neal v. Morris, 3 F.3d 143, 145 (6th Cir.1993) (holding that habeas petitioner bears burden of showing error not harmless), cert. granted in part sub nom. O'Neal v. McAninch, 114 S.Ct. 1396 (1994); Tague v. Richards, 3 F.3d 1133, 1140 (7th Cir.1993) (same); and Henry v. Estelle, 993 F.2d 1423, 1427 (9th Cir.1993) (same) with Libby v. Duval, 19 F.3d 733, 739 n. 15 (1st Cir.1994) (holding that state bears burden of showing error is harmless), petition for cert. filed, No.93-9781 (June 22, 1994); Lowery v. Collins, 996 F.2d 770, 773 (5th Cir.1993) (same); and Stoner v. Sowders, 997 F.2d 209, 213 (6th Cir.1993) (same)
 The Supreme Court has recently granted certiorari in O'Neal v. Morris to resolve the dispute over who bears the burden of proof regarding harmless constitutional error under the Kotteakos standard. See 62 U.S.L.W. 3680 (Apr. 12, 1994). We need not await the Supreme Court's decision, however, because we conclude that even if the state bears the burden of proving the error is harmless, it has met that burden here.