No. 70,476

STATE OF KANSAS, *Appellee*, v. STEVEN C. BAILEY, *Appellant*.

(889 P.2d 738)

Opinion filed January 27, 1995.

*Stephen C. Moss*, assistant appellate defender, argued the cause, and *Max Rowinsky*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Gwynne E. Harris*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by defendant, Steven C. Bailey, from his conviction for second-degree murder. He was sentenced to imprisonment for 15 years to life.

Defendant raises two issues on appeal. He first argues that he requested an attorney before being interrogated and that his confession and all evidence seized after the request should have been suppressed. His second claim is that the trial court erred in refusing to give a requested instruction on voluntary manslaughter.

Defendant was 37 years of age. The victim, Jenna Scott, was 18 years of age. They lived in Delphos, Kansas, and became engaged in July 1991. In August 1991, Scott moved to Topeka to attend a two-year paralegal program at Washburn University. In September, she terminated the engagement by telephone.

In November, defendant drove to Topeka to seek a reconciliation and, if that failed, to carry out a murder-suicide. The reconciliation failed and defendant, after telling Scott of his plan and showing her a handgun, returned to his home in Delphos.

Defendant returned to Topeka in January 1992 and, after a conversation with Scott, fired a .44 Magnum handgun four times at her. She was struck twice and died as a result of her wounds.

Later that evening, Deputy Sheriff King of the Ottawa County Sheriff's Department observed a car matching the description of defendant's car drive by defendant's parents' house in Delphos. Defendant engaged King and other law enforcement officers in a car chase at speeds exceeding 100 m.p.h. The chase ended when defendant's car hit a guardrail. At 7:48 p.m. King read the *Mir-*

*anda* warnings to defendant, and defendant indicated he understood them. Ottawa County Undersheriff Kindall asked defendant where the gun was, and defendant replied that the gun was under the seat.

Defendant was transported to the Ottawa County Sheriff's Department, and he was *Mirandized* again on the drive. Upon arriving at the station, defendant was given a written *Miranda* waiver form, which he read with King and signed. He also signed a consent to search vehicle form. He never asked King if he could consult with an attorney. Defendant volunteered to King that he was on his way to Pike's Trail Marker to kill himself.

Later that evening, defendant asked Undersheriff Kindall for advice concerning whether he should ask for an attorney at that time, and Kindall advised defendant that the Topeka detectives who would be interviewing him would answer all of his questions about an attorney. Sergeant Mills and Detective Fox of the Topeka Police Department arrived in Ottawa County to interview defendant. Fox read defendant his *Miranda* warnings. When Fox asked defendant if he would voluntarily give up his rights, defendant asked if he needed an attorney. Fox informed defendant that it was a decision only defendant could make, and defendant told Fox and Mills that he did not need an attorney.

Defendant admitted that he shot Scott. At least three eyewitnesses saw the shooting. Defendant told the officers that on January 27 he left Delphos at 12:30 p.m. and was feeling "down and out." Defendant drove to Scott's new apartment. He had found out her new address a week or so earlier by mailing a letter to her old address with a notation not to forward the letter but to return it to the sender with the new address, a trick he had learned by watching "Family Feud." When he arrived, he spoke briefly with Scott and then waited for her while she ran an errand. They then talked in Scott's front yard, and Scott showed defendant her apartment and introduced him to some friends. Defendant and Scott discussed that his parents were upset that she had broken their engagement suddenly and that her parents thought little of defendant because of the November incident when he threatened her with a gun. Defendant told Scott he hoped they could rebuild the relationship.

Defendant and Scott went back outside. Defendant asked Scott if they could correspond, and she replied that she might drop him a postcard. Defendant thought Scott was "blowing him off." Scott reached out her hand to shake hands with defendant, which defendant felt was cold and businesslike. (An eyewitness testified Scott hugged defendant.) As Scott walked back into her house, defendant pulled out a gun he had been carrying under his shirt in the front waistband of his pants. He knew the gun was loaded with six hollow point rounds. Scott was approximately 30 feet away from defendant when defendant fired the gun four times over a five- or six-second period. Defendant said he shot Scott as "punishment for what she had done to me."

Defendant then drove back to Delphos. Along the way, he stopped to reload the gun, and he dumped the four empty shells out along the road. He claimed he intended to go to Pike's Trail Marker to kill himself.

Sergeant Mills prepared a written statement based on the information defendant had provided. Defendant corrected two errors Mills had intentionally made and one grammatical error. Defendant signed the statement after reading it twice.

A search of defendant's car revealed numerous items. Three weapons were recovered from the car, including a .44 Magnum revolver loaded with six rounds. A box of 240-grain bullets was found in a knapsack in the car. A 1972 Dodge City class ring was found on the passenger floorboard. There was also a photo album and a letter addressed to defendant's parents. A 3" by 5" spiral notebook, a ring, and an envelope addressed to Scott were on defendant's person at the time of his arrest.

Other evidence at trial revealed that a bullet recovered from the floor near where Scott's body was found had been fired from the .44 Magnum found in defendant's car. The written materials in defendant's car and on his person were identified as having been written by defendant.

At trial, defendant presented testimony by friends and family that he was depressed and withdrawn after his first marriage ended approximately one-and-a-half years before he met Scott. However, after defendant met Scott his outlook on life changed

and he was more excited and happy. When Scott broke their engagement, defendant again became depressed and told a friend he had nothing to live for. He began having problems at work and was fired from his job on November 21, 1991, after missing work the previous day (when he had come to Topeka and threatened Scott).

Defendant presented a defense of diminished capacity. Dr. Fernando, a psychiatrist who evaluated defendant at Larned State Security Hospital, testified that defendant was not suffering from a mental illness or major depression at the time he killed Scott or at the time he was evaluated at Larned. Moreover, he opined that an individual suffering from a major depression would not necessarily be unable to think about what he was doing and act in a deliberate fashion.

Dr. Logan, the Director of the Department of Law and Psychiatry at the Menninger Clinic, also evaluated defendant. Logan opined that defendant had unrealistic expectations of his relationship with Scott because she was some 20 years younger than he, just out of high school, and ready to explore the world. After Scott terminated the engagement, defendant felt hurt, disillusioned, and betrayed, and he again became depressed. He started to drink more heavily. On January 27, 1992, the day of the shooting, defendant had consumed 24 beers according to his self-report, although Logan questioned the accuracy of the self-report. Defendant told Logan that he was thinking of committing suicide rather than murder-suicide, although Logan noted there was a possibility defendant was thinking of homicide because he had his gun in the waistband of his pants. Defendant told Logan he spoke with Scott for a time, and as he was leaving, Scott gave him a slight hug and then offered a handshake. Defendant told Logan his main thought was how to alleviate the pain in himself and Scott. He was unable to recall his internal thought processes. Logan testified:

"His perceptions were altered somewhat, and that's the way he experienced things around him. He talked about not being able to hear the shot or feel the recoil of the gun as he fired it. He did observe what was going on, . . . saw her running toward the steps, remembers her clutching up, and letting out a cry or a scream.

". . . [He] said he was not thinking in words, and had the thought, 'Oh, shit, I have hurt Jenna,' at one point, but he was not very good about sequencing these things, did not know why he fired again. Described the experience as happening, according to him, in slow motion . . . and gave the reference that it was like . . . it was on a screen, a TV camera, it was like a sensation of sort of watching something happen and not really being in touch with it. He did not know why he started shooting or stopped shooting, was what he said. His thought about leaving after this happened was to get back to the place where he had planned to kill himself, the Pike Trail Monument."

Logan diagnosed a major depressive disorder. He also diagnosed alcohol abuse. When asked whether the major depression and the alcohol abuse diminished defendant's capacity to form premeditation and deliberation, Logan stated:

"[W]hat a major depression does is it does not prohibit you from thinking or making plans to do something. What it does do is affect your ability to weigh the reasonableness of what you're going to do. Suicidal patients, particularly, can form all sorts of suicide plans to get the job done. What's lost in a major depression is any kind of objectivity about their situation that helps them decide whether a course of action is appropriate or not appropriate. In other words, they're so depressed, the world looks so bleak, that they cannot put things in perspective, they have lost their perspective on the world. From their standpoint . . . the world looks hopeless. . . . There is a sense of isolation, a sense of being alone. So, it does not affect your ability to make a plan to do something, but it certainly does affect your ability to think about the rationality of that plan, why you should choose to do that plan, to weigh the consequences of that plan. . . . [T]his is the reason why patients get hospitalized when they're suicidal and, in this case, homicidal is because they're really not competent to make decisions about what they do because their thinking is so colored by their emotional state."

"[H]is thinking about these ideas or thoughts, or whatever, are not the thinking of an ordinary man who is coming to a foolish decision, but the thinking of a very depressed man whose thinking is colored and determined somewhat by that depression. In this particular case, his plan, as it were, was not totally a murder-suicide, but was a man attempting reconciliation with perhaps a murder-suicide following it if the reconciliation failed. . . . [M]y understanding is that the decision to commit the murder-suicide, to actually act on those thoughts, was almost instantaneous based on his perception of rejection at that particular moment.

. . . .

". . . And this incident happened at the precise moment when one would expect Mr. Bailey's thinking to be most volatile, most based on emotion, and that is when he perceived a rejection from Jenna, the final rejection, being that

it's over, particularly in the context of his repeated thought throughout that time that he had nothing to live for, and his earlier anger at Jenna."

"[W]hen you talk about what happened at this point in time, the fact of the weak handshake, the hug, triggered something, he was very ambivalent, right on the edge . . . of wanting to get back to her, yet feeling despair if she did not agree with that, and so right at the very end, I think it was something very, very small, something very inconsequential that pushed him over the edge to actually start the shooting based on his own liability, the suddenness with which his moods could change which is not unusual in depressed individuals of this type."

The jury was instructed on first-degree murder and second-degree murder. The trial court refused to instruct the jury on voluntary manslaughter despite defendant's request. Instructions on the defenses of diminished capacity, abandoned premeditation, and voluntary intoxication were submitted to the jury.

The jury convicted defendant of second-degree murder. Defendant was sentenced to a term of incarceration of 15 years to life.

### SUPPRESSION OF EVIDENCE

Prior to trial, defendant sought to suppress the statement he gave police, the .44 Magnum revolver seized from his car, and the fruits of a search warrant executed at his residence.

A hearing on suppression of defendant's statement was held prior to trial. Pertinent portions of the testimony are as follows: Ottawa County Sheriff's Deputy King testified that after defendant's car crashed into the guardrail and defendant was ordered out of the car, Undersheriff Kindall asked defendant where the gun was, and defendant replied that it was under the seat. Defendant was then handcuffed and taken to Kindall's vehicle, where King advised defendant of his *Miranda* rights. King again advised defendant of his rights during the drive to the sheriff's office. After arriving at the office, King obtained a written *Miranda* waiver from defendant. Defendant also signed a consent to search vehicle form at that time. The car was not entered until some time after the consent form was signed.

Kindall testified that he asked defendant where the gun was when defendant was handcuffed and lying face down on the as-

phalt by his car. Kindall further testified that in the interrogation room of the courthouse and in the presence of two Topeka officers, "Mr. Bailey turned to me and asked me for advice in reference to an attorney. . . . He just asked me if he should ask for an attorney at that time." Kindall advised defendant "that the two Topeka detectives would answer all of his questions for him in reference to an attorney." Defendant responded, "Okay."

Sergeant Mills did not hear defendant's exchange with Kindall concerning asking for an attorney. Mills testified that Detective Fox read defendant his *Miranda* rights. After Fox asked defendant if he voluntarily gave up his rights, the following occurred: "At that point, Mr. Bailey turned and looked at us and asked us if he needed an attorney. And Detective Fox replied back to him that that was not a decision for us to make, but that was his decision, that's why we read him these rights. He then told us that he didn't need the attorney." Defendant made no other request for an attorney, and Mills did not offer to get an attorney for defendant.

The trial court denied the motion to suppress. The court found the following: Defendant was read his *Miranda* rights at the scene of his arrest, and he indicated he understood them. Defendant was again read his *Miranda* rights while being transported to the sheriff's department. At the department, defendant was *Mirandized* a third time, this time from a written form. Defendant initialled each right, signifying he understood it as it was read. He also initialled the written waiver, which stated, "At this time, I am willing to answer questions without talking to a lawyer and I do not want a lawyer present during questioning." Later, defendant asked Kindall if he should ask for an attorney, and Kindall responded that the Topeka detectives would answer all of his questions in reference to an attorney. After Sergeant Mills and Detective Fox arrived, Fox read the *Miranda* rights to defendant once again, and defendant indicated after each sentence that he understood each right. The trial court found:

"At the conclusion, Detective Fox asked defendant, 'Do you understand these rights? Do you voluntarily give up these rights?' Mr. Bailey turned, looked at the officers, and asked if he needed an attorney. Detective Fox replied it was

not a decision for the officers to make; that this was defendant's decision and that was why the officers had read the rights to defendant. Thereupon, the defendant told the officers that he did not need an attorney. Detective Fox then asked Mr. Bailey if he would tell them what happened in Topeka. The defendant made no further reference to the right of counsel during the remainder of the interview."

The court further found that defendant was not tricked, threatened, or mistreated before, during, or after the interview.

The trial court held that defendant's inquiries to Kindall and to Fox were unambiguously interrogatory in nature. Kindall's response that the Topeka detectives would answer questions concerning an attorney was not misleading and it was entirely proper under the circumstances. Fox's answer was also entirely correct and fully in accord with the law. Fox had no duty to advise defendant whether to exercise his right to counsel. Defendant's immediate and unambiguous assertion that he did not need an attorney was a voluntary, knowing, and intelligent decision to waive his rights.

With respect to suppression of the gun, defendant's trial counsel argued that the gun was seized pursuant to a search warrant obtained in part based on defendant's statement at the time of his arrest and before he was *Mirandized* that the gun was under the seat of his car. The court also denied this motion, finding that Kindall's question asking defendant where the gun was occurred after a high-speed chase and a report that defendant was a suspect in a shooting and therefore fell within the "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers can be admitted into evidence. See *New York v. Quarles*, 467 U.S. 649, 81 L. Ed. 2d 550, 140 S. Ct. 2626 (1984). We agree.

The motion to suppress the fruits of the search warrant executed at defendant's residence was likewise denied because the search warrant was obtained based on defendant's statement, which the court had found was valid and admissible.

The rules concerning custodial interrogation are well established. A suspect in custody must be advised that he or she has the right to remain silent and the right to the presence of counsel before the suspect may be interrogated. *Miranda v. Arizona*, 384

U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). If the accused asks for counsel, the interrogation must cease until counsel is present. 384 U.S. at 474. See *Edwards v. Arizona*, 451 U.S. 477, 481-82, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981).

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused, . . . having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Edwards*, 451 U.S. at 484-85.

The burden is on the prosecution to show that events subsequent to a request to have counsel present during interrogation constitute a waiver of the previously asserted right. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983). The court must first determine whether the accused actually invoked the right to counsel and, if so, the court must then determine whether (a) the accused initiated further discussions with the police and (b) the accused knowingly and intelligently waived the previously asserted right. *Smith v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984). Waiver of the right to counsel must be knowing, voluntary, and intelligent under the totality of the circumstances. See *Bradshaw*, 462 U.S. at 1046.

The United States Supreme Court recently clarified the course of action required when a suspect makes an ambiguous request to have counsel present during custodial interrogation. *Davis v. United States*, 512 U.S. \_\_\_, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994). Davis, a member of the U.S. Navy, initially waived his right to remain silent and his right to counsel during interrogation by Naval Investigative Services agents concerning the murder of another sailor. An hour and a half into the interview, Davis said, "Maybe I should talk to a lawyer." 512 U.S. at \_\_\_, 129 L. Ed. 2d at 368. The agents inquired if Davis was asking for a lawyer or was merely making a comment about a lawyer, and Davis said he was not asking for a lawyer and did not want a lawyer. Following a short break, the agents reminded Davis of his right to remain silent and his right to an attorney, and the interview con-

tinued for an hour. At that time Davis said, "I think I want a lawyer before I say anything else," and the interview ceased. 512 U.S. at ___, 129 L. Ed. 2d at 368-69. A military judge denied Davis' motion to suppress his statements, holding that his statement was not a request for counsel.

The United States Supreme Court affirmed admission into evidence of Davis' statement and his subsequent conviction for murder. The Court noted that *Edwards* first requires a determination that the accused actually invoked his right to counsel. This inquiry is an objective one, requiring some statement which can reasonably be construed to be an expression of a desire to have the assistance of counsel. *Davis*, 512 U.S. at ___, 129 L. Ed. 2d at 371. However, the *Davis* Court continued: "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." 512 U.S. at ___, 129 L. Ed. 2d at 371. When the officer reasonably does not know whether the suspect is requesting counsel, the officer "may continue questioning until and unless the suspect clearly requests an attorney." 512 U.S. at ___, 129 L. Ed. 2d at 373. There is no obligation to stop questioning if the statement concerning counsel is not unambiguous or unequivocal. The Court went on to recommend that where there is an ambiguous or equivocal statement concerning the assistance of counsel, it is good police practice for the officer to clarify whether the suspect actually wants an attorney. 512 U.S. at ___, 129 L. Ed. 2d at 373.

In *State v. Morris*, 255 Kan. 964, 971, 880 P.2d 1244 (1994), this court reiterated our standard of review concerning admission of custodial statements:

"When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at trial, an appellate court accepts that determination if it is supported by substantial competent evidence. See *State v. Johnson*, 253 Kan. 75, 83-84, 853 P.2d 34 (1993)."

See also *State v. Garcia*, 250 Kan. 310, Syl. ¶ 2, 827 P.2d 727 (1992) ("If the findings of the trial court on a motion to suppress

evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court."). The trial court here did conduct a full evidentiary hearing and determined that defendant made a voluntary, knowing, and intelligent waiver of the right to counsel, and this court will accept that determination if it is supported by substantial competent evidence. Substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Garcia*, 250 Kan. 310, Syl. ¶ 3.

This court in *Morris* adopted the *Davis* rule that when a suspect makes an ambiguous statement concerning the right to counsel, clarification is preferred but not required. 255 Kan. at 974-76.

Defendant argues that his statement to Undersheriff Kindall was clearly and unambiguously a contemporaneous request for counsel. He emphasizes that Kindall's testimony was that defendant asked, "[D]o I ask for an attorney *at this time?*" Kindall's testimony was actually, as stated above, that defendant asked "if he *should* ask for an attorney at *that* time." This can be interpreted either as asking whether he should ask for counsel at all, or it can be interpreted as a question as to when was the proper time to make a request for counsel. Defendant also argues that the response by Detective Fox to defendant's question whether he needed an attorney ignored his request for counsel.

Defendant asserts that his request of Kindall is similar to the defendant's request in *Edwards v. Arizona*, 451 U.S. 477. Edwards sought to "make a deal" but then said, "I want an attorney before making a deal." 451 U.S. at 479. The next morning, two detectives again informed Edwards of his *Miranda* rights, and Edwards agreed to give a statement as long as it was not tape-recorded. After being informed that the officers could testify in court concerning whatever Edwards said even if it was not tape-recorded, Edwards replied, "I'll tell you anything you want to know, but I don't want it on tape." 451 U.S. at 479. The trial court admitted Edwards' statement at trial, and the United States Supreme Court reversed, finding that Edwards had expressed his desire to deal with the police only through counsel and that he

had not himself initiated further contact with police. 451 U.S. at 487.

Defendant also compares the factual situation here to that which occurred in *Smith v. Illinois*, 469 U.S. 91. Smith was advised he had the right to consult with an attorney and to have an attorney present during questioning, to which Smith stated, "Uh, yeah. I'd like to do that." The interrogating officers then continued reading Smith his *Miranda* rights and then asked Smith if he wished to talk to them without an attorney present. Smith replied, "Yeah and no, uh, I don't know what's what, really." After being told that he could agree to talk to the officers without an attorney present and that if he so agreed, he could stop questioning at any time, Smith stated, "All right. I'll talk to you then." 469 U.S. at 93. Holding that Smith's initial request for counsel ("Uh, yeah. I'd like to do that") was not ambiguous and that his subsequent responses could not be used to cast doubt on his initial request, the United States Supreme Court held that his statement was inadmissible. 469 U.S. at 97-99.

The factual situations in *Edwards* and *Smith* are not analogous to what occurred in this case. Defendant made no unambiguous request for counsel here. He did not ask to consult with counsel or to have counsel present during questioning. He merely asked whether he should ask for an attorney and whether he needed an attorney. The trial court held that defendant's statements were interrogatory in nature and not assertions of the right to counsel. This finding is supported by substantial competent evidence. As in *Morris*, defendant's statements to Kindall and Fox did not invoke any particular right, let alone all rights. There was no error in admitting into evidence defendant's confession.

Defendant also indicates that at the least, his request for counsel was ambiguous. He cites *State v. Ninci*, 19 Kan. App. 2d 192, 865 P.2d 1078 (1993), *rev. denied* 254 Kan. 1009 (1994). In *Ninci*, the Court of Appeals held that where a suspect makes an ambiguous or equivocal request for counsel, the request must be interpreted in favor of the right to counsel. After such an ambiguous request, all interrogation must immediately cease except for further questions designed to clarify whether the sus-

pect is invoking the right to counsel, and failure to clarify the ambiguous request renders inadmissible all portions of the suspect's statement made after the request. 19 Kan. App. 2d 192, Syl. ¶¶ 2-4. Ninci was advised of his *Miranda* rights and signed a waiver of those rights. After being asked to sign consent to search forms, defendant stated, " 'I'm just asking you . . . . I mean, I know I'm trying to help you out, but do I, I, ah, I mean, I mean, I don't know, *do I need to have a lawyer right now*? I understand this and I want to help.' (Emphasis added.)" 19 Kan. App. 2d at 194. The officers did not attempt to clarify whether Ninci was invoking his right to counsel. The trial court suppressed the statement Ninci subsequently gave. The Court of Appeals affirmed, holding that Ninci's statement concerning counsel was ambiguous and that it therefore must be construed liberally as a request for counsel. 19 Kan. App. 2d at 196.

In *Morris*, this court, relying on *Davis*, overruled *Ninci* to the extent *Ninci* requires that ambiguous requests for counsel be liberally construed and be clarified before questioning continues. *Morris*, 255 Kan. at 976.

Here, while defendant's statements concerning whether he should ask for counsel and whether he needed counsel could be construed to be ambiguous, and therefore Kindall and Fox could have asked further questions to clarify whether defendant was invoking the right to consult with an attorney, the officers were not required to so clarify. Detective Fox informed defendant that it was defendant's decision whether he needed an attorney, and defendant then decided that he did not need an attorney. The trial court did not err in holding defendant's confession was made knowingly, voluntarily, and intelligently and in denying defendant's motion to suppress the confession and the evidence seized subsequent to his confession.

## VOLUNTARY MANSLAUGHTER

Defendant also asserts that the trial court erred in refusing his request to instruct the jury on the lesser included offense of voluntary manslaughter.

K.S.A. 21-3107(3) governs a trial court's duty to instruct the jury on lesser included offenses:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged, but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

The crime of voluntary manslaughter includes the intentional killing of a human being upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403. It is a lesser included offense of first-degree murder. *State v. Seelke,* 221 Kan. 672, 675, 561 P.2d 869 (1977).

"In order for a defendant charged with murder to be entitled to a jury instruction on voluntary manslaughter because he acted in the heat of passion, his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation."

"The test of the sufficiency of the provocation is objective, not subjective. The provocation, whether it be 'sudden quarrel' or some other form of provocation, must be sufficient to cause an ordinary man to lose control of his actions and his reason. In applying the objective standard for measuring the sufficiency of the provocation, the standard precludes consideration of the innate peculiarities of the individual defendant." *State v. Guebara,* 236 Kan. 791, Syl. ¶¶ 2, 3, 696 P.2d 381 (1985).

See *State v. McClanahan,* 254 Kan. 104, 114, 865 P.2d 1021 (1993); *State v. Ritchey,* 223 Kan. 99, 101, 573 P.2d 973 (1977).

" 'Heat of passion' means any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror. Such emotional state of mind must be of such a degree as would cause an ordinary [person] to act on impulse without reflection." *Guebara,* 236 Kan. at 796.

Defendant emphasizes that he was diagnosed as suffering from a major depressive disorder and that there was some testimony he reported consuming 24 beers prior to shooting Scott. Defendant argues the shooting was the result of his depression and despair, which caused him to lose reason and act on impulse. Defendant reasons that Dr. Logan's testimony that defendant's act was impulsive, volatile, and emotional constitutes some evidence tending to establish voluntary manslaughter. He asserts that because the jury convicted him of second-degree murder rather than first-degree murder, the jury accepted his theory of diminished capacity. Contrary to defendant's assertion, the fact that the

jury convicted him of second-degree murder does not mean the jury accepted his theory of diminished capacity; the jury could have convicted defendant of second-degree murder under his theory of abandoned premeditation.

In refusing to instruct the jury on voluntary manslaughter, the trial court held that the hug and handshake which preceded the shooting did not constitute evidence of heat of passion or sufficient provocation warranting an instruction on voluntary manslaughter. In the words of the trial judge, "By no stretch of the imagination could anyone view a hug or a handshake as provocation if we use an objective standard."

In *State v. Jackson*, 226 Kan. 302, 307, 597 P.2d 255 (1979), *cert. denied* 445 U.S. 952 (1980), this court stressed that the test of the sufficiency of provocation to constitute heat of passion is an objective test, not a subjective one. Jackson was accused of killing a gas station attendant. In his confession, Jackson stated that he told the attendant about an argument with his father, and the attendant told Jackson, "Rodney, no matter what, the man is your father. You have to respect him." After hearing those words, Jackson related that he "just went off" and shot the attendant six times. 226 Kan. at 306-07. Jackson argued that the "ordinary person" test should not be used; rather, the facts should be evaluated according to the reactions of a man with a low intelligence quotient and a history of mental disturbance. This court refused to depart from the objective standard, which "precludes consideration of the innate peculiarities of the individual defendant," and held that there was no error in refusing to instruct on voluntary manslaughter. 226 Kan. at 307.

In *Guebara*, 236 Kan. 791, a similar argument was made. Guebara shot and killed his wife. Guebara's wife had filed for divorce, which made Guebara angry. She also had filed criminal charges alleging misdemeanor battery and misdemeanor theft. The day after Guebara was served with a warrant on the charges and made his initial appearance, Guebara's wife picked up his daughter according to a visitation schedule. Guebara handed his wife the criminal process papers. According to Guebara, his wife told him she had tried to drop the charges but was unable to, and Guebara

immediately became angry, pulled out his gun, and started shooting his wife. Guebara presented evidence that he had smoked one and a half marijuana joints just before the shooting; that he was diagnosed with an anti-social personality disorder; and that he was a person who, when put into pressure situations, was likely to respond in a violent, impulsive, quick manner. He had indications of a gross thought disorder which might lead to an inability to assess reality accurately and respond to it accordingly. 236 Kan. at 792-94. In affirming the trial court's refusal to instruct the jury on voluntary manslaughter, this court found that "although the requisite emotional state necessary to constitute heat of passion was present, the evidence in the record does not show that defendant's emotional state of mind arose from circumstances constituting sufficient provocation." 236 Kan. at 797.

*State v. Hamons*, 248 Kan. 51, 805 P.2d 6 (1991), is also instructive. Hamons was convicted of first-degree murder in the stabbing death of his girlfriend's sister. Hamons' cell mate testified that Hamons told him he was having an affair with the victim, Julie. He and Julie were high on cocaine, and Julie threatened to tell her sister, Hamons' girlfriend, about the affair if he did not give her more cocaine. Hamons told his cell mate that he just "went off" and stabbed Julie. At trial, Hamons testified that he went to Julie's apartment and found her in the closet, dead. 248 Kan. at 54-55. The trial court refused to instruct the jury on voluntary manslaughter. This court affirmed, holding that Hamons' cell mate's testimony that Julie had threatened to tell her sister that she and Hamons were having a sexual affair was not evidence of sufficient provocation for voluntary manslaughter. 248 Kan. at 63.

There is no evidence in the record here that the circumstances occurring prior to Jenna Scott's shooting—the exchange of a hug and a handshake—constituted sufficient provocation under which an ordinary person would lose control of his or her actions and reason. The facts that defendant suffered from a major depressive disorder and that he claimed to have consumed 24 beers prior to the shooting are not relevant to the application of the objective test. The trial court is not required to instruct on lesser included

offenses unless there is substantial evidence upon which defendant might reasonably have been convicted of the lesser offense. *State v. Mitchell*, 234 Kan. 185, 189, 672 P.2d 1 (1983). A handshake and a hug do not constitute sufficient provocation upon which a jury could reasonably have convicted defendant of voluntary manslaughter. The trial court did not err in refusing to instruct on voluntary manslaughter.

Affirmed.