No. 74,774

STATE OF KANSAS, *Appellee*, v. DAVID A. MONCLA, *Appellant*.

(936 P.2d 727)

Opinion filed April 18, 1997.

*Wendy L. Rhyne Slayton*, special appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with her on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, David A. Moncla, was convicted of first-degree premeditated murder in the death of Diane Swinney, a local bar owner in Wichita. He was sentenced to serve a hard 40 sentence under the provisions of K.S.A. 1993 Supp. 21-4635. He appeals his conviction and sentence, raising six errors relating to the admission of evidence, trial court instructions, and sentencing procedures. For the reasons set forth below, we affirm the defendant's conviction and sentence.

The defendant was charged with first-degree murder on February 1, 1995, in Sedgwick County District Court. The victim was a friend of the defendant's. She was found in her apartment by Kevin Robertson, who assisted her at the bar. Robertson picked the lock to her apartment after employees, friends, and roommates, believing she was asleep, periodically pounded on her door throughout the day in order to wake her.

The coroner who performed the autopsy found at least 18 blows to Swinney's head as well as bruises and contusions on other areas of her body which the coroner believed were, in part, defensive injuries. The coroner opined that the weapon used was a claw hammer that the police found in the bathroom of her apartment. The

coroner concluded the cause of death was injuries to the brain and skull.

Friends and employees detailed their last encounters with Swinney on the night of her death. Swinney worked at her bar, Star's Club, until approximately 2 a.m., when she closed with the help of an employee, Linda Brown. She left the bar with eight cans of beer and drove to her home, located a block or two from the bar. Other than the defendant's testimony, this was the last information known about Swinney before her death.

Swinney rented the upstairs apartment of the house from Ricky Eugene "Norm" Hall. She had lived there for approximately 3 months. At the time of Swinney's death, Pat Berry, Katherine "Cat" Cunningham, and the defendant were staying at the house. Berry and Cunningham slept on couches and mattresses in the downstairs area of the house. The defendant often slept in a recliner upstairs in Swinney's room, but at times he also slept downstairs. He had been living there for less than a week when the murder occurred.

Pat Berry testified that the defendant left the house on foot early in the morning of the day Swinney's body was discovered. The defendant told Berry that he was leaving because he was late to work and because Swinney was upstairs having sex with someone and he did not want to watch. The landlord, Hall, who was half asleep at the time, heard Berry and the defendant talking but could only remember a small part of what they said.

Carl Guy testified that the defendant knocked at his door that morning about 9:00. The defendant asked Guy for a ride to work. On the way, Guy stopped at a gas station, and the defendant pumped the gas. While he was filling the car, the defendant spilled gasoline on his jeans. Guy testified that he dropped off the defendant at a QuikTrip.

John Bayliff testified that the defendant arrived at his house on foot between 9:00 and 9:30 that morning. The defendant told Bayliff that people were after him and he needed a place to stay. The defendant spent the day with Bayliff, and at 6 p.m. they watched the local news. When the defendant saw the broadcast about Swinney's murder, he spoke to Bayliff about what he had witnessed at

Swinney's house. His story, as repeated by Bayliff at trial, was by and large consistent with the defendant's testimony at trial. The defendant remained with Bayliff for several days, until he was arrested.

The defendant testified that on the morning of the murder, he was sleeping on Swinney's recliner when he was awakened by a man hitting him over the head with a gun. He noted that there were three men in the room and that they were wearing the gang colors of Los Foresteros, a motorcycle gang. His attacker pushed the defendant around the corner from the bedroom and into the bathroom, where he could no longer see Swinney. He heard several slaps or hits and heard someone say: "[W]e're going to have to take a loss on this one." He also heard the name Kevin. At trial, the defendant testified that upon seeing Kevin Robertson on the stand, he became convinced that Kevin Robertson was the man who had hit him.

After the men left, the defendant reentered the bedroom and saw Swinney crying on the floor with a pillow over her head. He removed the pillow and knelt beside her. She was beaten up but still alive. The defendant testified that Swinney asked him to "stay out of it," so he left her and left the house.

The State presented testimony concerning the physical evidence found at the scene. A pillow and a woman's coat were found near Swinney's body, each bloody and ripped. The defendant's fingerprints were on several beer cans Swinney had brought to her house after closing the bar the night of her death. His prints were also found on several discarded cans in her wastebasket. In the bathroom, the police found a claw hammer under a cabinet with human blood under its head.

Police investigators discovered bloodstains on the defendant's jeans. The defendant explained that the blood on his jeans was probably from kneeling at the victim's side after she had been attacked. The authorities were unable to identify the blood on the defendant's jeans as the victim's blood because gasoline had been spilled on his jeans.

A Kansas Bureau of Investigation forensics scientist, Kelly Robbins, testified that using Lumninol testing, she observed a blood

spatter impact pattern on the jeans the defendant was wearing the night of the murder. She testified that an impact pattern is created by force coming into contact with blood. While Robbins concluded that the jeans showed several small stains from the knee down that were consistent with impact force, she also concluded those stains were inconsistent with contact stains that would be created by the act of kneeling in blood.

The defendant testified on his own behalf and claimed that others had committed the crime. He presented evidence of Swinney's mounting debts to suggest a motive. He also attacked the police investigation as inadequate in following up leads on other suspects. The defendant claimed that Robertson, the man who found the body, was involved in the murder and that a man named Danny Long committed the murder. The police had received a Crime Stopper tip on Long. In addition, Robert Wisley, a friend of Long's, testified that Long approached him in a bar and confessed to Swinney's murder, specifying that he used a hammer to do it.

The defendant argues that his conviction must be reversed for errors in: (1) the admission of polygraph evidence; (2) the admission of past crimes and bad acts; (3) the trial court's instruction on premeditation; (4) the failure to instruct on the lesser included offense of voluntary manslaughter; and (5) the admission of gruesome and repetitive photographs. The defendant also claims that his hard 40 sentence must be set aside because the law authorizing its imposition has not been followed. Additional facts necessary for consideration of the defendant's claims are set forth below.

## ADMISSION OF POLYGRAPH EVIDENCE

The defendant challenges the admission of evidence indicating that the alternate suspect, Long, had taken a polygraph test concerning his involvement in the crime. This evidence was admitted during the State's cross-examination of police detective Timothy Relph. The defendant argues that the admission of this evidence, without a limiting instruction, encroached upon his right to present a defense and denied him a fair trial.

Defense counsel sought to exclude the admission of polygraph evidence by the following motion in limine:

"MS. MARTIN: I have a brief motion in limine. Your Honor, I'm going to place Detective Relph on the stand next; and I intend to ask him a few questions about Danny Long. At this point, Mr. Long was administered of [*sic*] polygraph examination last week. It's my understanding that polygraph examinations are not admissible, and we would ask for an order in limine preventing the State from asking as to whether or not Mr. Long was administered a polygraph or whether he was offered a polygraph or pre-polygraph.

"MS. PARKER [Prosecutor]: It's my understanding of the law, results of polygraph are not admissible. Whether, in fact, a person took one is admissible; and we would like to ask about that; and I do intend to do so, if the Court will allow me to.

"THE COURT: Well, it's my understanding the results of polygraph examinations are inadmissible in court because of their lack of accuracy from time to time. However, in light of the testimony—I'm sorry—the opening statement and the argument of counsel—I think the State should be allowed to indicate what investigative tools they used in this particular case. I will not prevent the State from going into the fact this person was given a polygraph. I will prohibit the State from mentioning anything else whatsoever about the results of that polygraph examination.

"Anything further?

"MS. PARKER: The Court allow me to ask Detective Relph that he, in fact, after the polygraph determined that he [Long] was not a suspect.

"THE COURT: Well, not couched in those words. I will allow you to ask the detective if after all of the investigations that were utilized what if any determination was made.

"MS. PARKER: Thank you.

"THE COURT: But I will not allow you to back-door in the results of a polygraph examination.

"MS. PARKER: I understand. That's why I was asking for clarification."

Following the defendant's direct examination of Detective Relph, there was a lengthy hearing outside the presence of the jury on matters other than the polygraph evidence, followed by a short recess. The State then cross-examined Detective Relph:

"Q. Regarding Danny Long, you were present when Mr. Wisely was here [and testified to Long's confession]. Did you investigate Danny Long?

"A. Yes, I did.

"Q. All right. And in part of that investigation, did you ask him to take a polygraph?

"A. Yes, I did ma'am.

"Q. And did he take a polygraph?

"A. Yes, he did.

"Q. After your investigation of him, were you able to rule him out as a suspect?

"A. Yes, I was, ma'am.

"Q. And in addition to the polygraph, didn't you also submit his fingerprints that were taken from that scene to determine whether his fingerprints were found anywhere at that scene?

"A. I did submit a request, yes, ma'am.

"Q. And did you get a result?

"A. Yes, ma'am.

"Q. And what was that?

"A. His fingerprints were not located at that scene."

The prosecutor did not directly introduce results of the polygraph examination, but the prosecutor did not follow the clear instructions of the court not to bring the results of a polygraph examination in by indirect means. We do not condone such action on the part of the prosecutor. At the same time, the defendant did not object to the prosecutor's questions, did not move for a mistrial, and did not request a limiting instruction. In *State v. Massey*, 242 Kan. 252, 262, 747 P.2d 802 (1987), one of the issues before this court was "whether the trial court erred in failing to grant a mistrial when a State's witness, who was warned of an order in limine, violated that order while giving testimony before the jury."

The evidence in question in *Massey* was a bedspread with a small hole in it. The defendant had been charged with murder of his wife. There were no powder burns surrounding the entrance wound on the victim's head. One explanation consistent with the defendant's defense of accidental discharge of the weapon was that the gun was at least 2 feet away from the victim when fired. The other explanation for the lack of powder burns was that a barrier was inserted between the gun and the victim's head. The State theorized the defendant pulled the bedspread over the victim's head before aiming the gun close to her head.

Over the objection of defense counsel, the bedspread was admitted on the understanding that the jury would be left to draw its

own conclusion about the hole. The bedspread had not been examined to determine if the hole was from a gunshot. Contrary to this understanding, the prosecutor elicited from the detective that the hole "appeared to be a bullet hole through the bedspread." 242 Kan. at 263. Defense counsel immediately moved for a mistrial, which was eventually denied by the trial court. On appeal, we said:

"We find no Kansas cases in which improper testimony was given in violation of an order in limine. However, some jurisdictions hold defiance of an order in limine is not reversible error as long as the trial court instructs the jury to disregard the testimony. Michigan has found instructing the jury to disregard can cause even more prejudice to the defendant, and therefore holds a new trial is necessary regardless of limiting instructions. Texas has held there is no reversible error if the defendant did not object at trial. See Annot., 63 A.L.R.3d 311, § 4." 242 Kan. at 265.

In *Massey*, we concluded that the violation of the order in limine prejudiced Massey and that the trial court abused its discretion in failing to grant a mistrial. 242 Kan. at 265. The basis for our review was the trial court's denial of the defendant's motion for mistrial. In this case, the defendant did not object to the questions of the prosecution which arguably violated the trial court order in limine. In the absence of an objection, the error raised is not preserved for review. If a motion in limine is granted to preclude the introduction of certain evidence during trial, and the party in whose favor the ruling has been made fails to object to evidence introduced in violation of the order in limine, the failure to object results in the issue not being preserved on appeal. Consistent with the provisions of K.S.A. 60-404, a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears, on record, an objection to the evidence timely interposed and so stated as to make clear the specific grounds of objection.

## ADMISSION OF PAST CRIMES AND BAD ACTS

Prior to trial, the State filed a motion to admit the defendant's past crimes and prior bad acts under K.S.A. 60-455 for the purpose

of identity. The defendant's prior acts included various physical attacks by the defendant on both men and women, in particular, beatings inflicted by the defendant on past girlfriends. In addition, the State wished to introduce evidence of recent problems between the defendant and the victim.

The State also filed a motion to consolidate the present murder trial with a trial on a charge of aggravated battery stemming from a fight between the defendant and his most recent ex-girlfriend, Sherry Bornhouser. The State argued that the crimes were connected because the defendant fled Bornhouser's house after the battery, stole her car, and moved in with Swinney only a few days prior to Swinney's death.

After hearing arguments, the trial court denied both motions. The trial court ruled under the provisions of K.S.A. 60-455 that the prior bad acts were not substantially similar and that the evidence was more prejudicial than probative. The court explained:

"[T]he Court just looks to vast number of cases there is, feels that what that would say to a jury was this Defendant has a propensity to commit violent acts upon women. Rather than showing this Defendant was the same person who committed the offense upon this victim. The issue of identity. At this point, I will overrule that."

The trial court found the motion for joinder was untimely. Despite the fact that the court determined that the cases should probably be consolidated for judicial economy, it held that a consolidation would not allow enough time for the defendant to adequately prepare for a trial on both charges.

The defendant argues that the State presented evidence to the jury in violation of the trial court's pretrial rulings. However, the objections of defense counsel during the course of trial were all based upon relevancy. In each of the instances referenced on appeal, the defendant's counsel objected to the testimony on prior bad acts in two ways. First, she objected stating relevancy as the basis of the objection, and second, she objected asking the court for a sidebar conference. The content of the sidebar conferences was not recorded. For reasons unknown, defense counsel did not request that such conferences be placed on the record.

The defendant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, an appellate court presumes that the action of the trial court was proper. *State v. Richardson*, 256 Kan. 69, 84, 883 P.2d 1107 (1994). The defendant had the responsibility to invite the court reporter to record the substance of the sidebar conference. Because the issue of admissibility under K.S.A. 60-455 was never brought up on the record, we must conclude that the trial court correctly applied K.S.A. 60-455 and the issue was not preserved for review.

The first instance complained of involved the State's cross-examination of the defendant's former girlfriend. The State sought to elicit answers as to whether the defendant left his girlfriend's house because he beat her. However, the court sustained all objections relating to this incident, and when his girlfriend answered the direct question, she stated she did not know why the defendant left her house to stay with the victim. In the same cross-examination, the State sought to elicit information that the defendant departed with food stamps and his girlfriend's car. She testified that the defendant had permission to possess the food stamps, and the court sustained the objection to the question as to whether the defendant had permission to take her car. Nothing in these exchanges provides a basis for reversal.

The defendant next complained that evidence introduced during his cross-examination provides a basis for reversal. While the State sought to establish that the defendant took food stamps and a car from his girlfriend, most of the questions asked were objected to and the court sustained the objections. The defendant clearly established that he did not take anything from his girlfriend. Moreover, when asked whether he had been responsible for an earlier beating of the victim, the defendant stated clearly that he had not been responsible. Further inquiry was objected to and sustained by the court. Nothing in this cross-examination provides a basis for granting the defendant a new trial.

In both of the above instances, the parties agree that most of the defendant's objections were sustained. Our examination of the

record demonstrates that neither the questions nor the answers to these questions incriminated the defendant in prior bad acts.

Finally, the defendant objects to evidence introduced during a taped interview with his friend Bayliff, which was played to the jury. At trial, the defendant first objected to the introduction of the tape and asked to approach the bench. The record reflects that a discussion was held between the court and counsel at the bench outside the presence of the jury and the court reporter. Again, this conference was not on the record. Thereafter, the defendant lodged the following objection on the record: "Your Honor, for the record we do have an objection to some irrelevant information that's contained in the statement about Mr. Bayliff's wife and other individuals. We would ask that those portions be redacted, either manually by Detective Andree or by the State, if they want to take a break." The State agreed to redact the objectionable material, and the court admitted the tape with that understanding.

The tape was played to the jury, but the record does not reflect which portions were redacted and which were objectionable. The defendant contends on appeal that the tape of Bayliff's interview with the police included references to domestic violence warrants and remarks about the defendant having a fight with his "old lady" and the existence of a restraining order against the defendant. However, we note that after the tape was played to the jury, defense counsel established by her questions that the defendant did not have anything to do with the beating of the victim. Defense counsel, through her questions, further established that four men came into the victim's apartment that night and that the defendant did have a knot on his head, which corroborated his contention that one of the individuals hit him in the head with a gun. In the absence of a record concerning objections made by defense counsel, and based upon the record before us, we conclude that the evidence admitted does not constitute grounds for reversal.

The defendant asserts that the State deliberately introduced inadmissible evidence, thereby depriving him of his constitutional right to a fair trial. The trial court sustained six of the defendant's nine objections based upon relevancy. Our review of the three instances complained of provide no basis for reversal. Even if we

assume prosecutorial misconduct, when a decision must be made "whether prosecutorial misconduct requires reversal, an appellate court determines whether there was little or no likelihood the error changed the result of the trial." *State v. Chism*, 243 Kan. 484, 493, 759 P.2d 105 (1988). Our standard of review in resolving the defendant's claim that he was denied a fair trial is:

"An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare an error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial." *State v. McClanahan*, 259 Kan. 86, 102, 910 P.2d 193 (1996).

We will not "find reversible error when an objection to a prosecutor's question or statement has been sustained," *State v. Pioletti*, 246 Kan. 49, 67, 785 P.2d 963 (1990), unless the remarks were so prejudicial as to be incurable. *State v. Pursley*, 238 Kan. 253, 265, 710 P.2d 1231 (1985). On the record before us, we conclude that the evidence complained of "had little, if any, likelihood of having changed the result of the trial." *McClanahan*, 259 Kan. at 102.

## INSTRUCTION ON PREMEDITATION

The defendant objected to the trial court's instruction concerning premeditation. The trial court instructed the jury that "[p]remeditation means to have thought over the matter beforehand. There is no particular time period for premeditation and it may arise in an instant." The first sentence of the court's instruction is taken from PIK Crim. 3d 56.01. The court modified the PIK instruction with the addition of the second sentence.

The following exchange between the defendant's counsel and the trial court occurred:

"MS. MARTIN [counsel for the defendant]: Your Honor, only objection is that it's not pursuant to either the State's requested jury instructions or the defendant's; and as to the last clause of it—and it may arise in an instant—we would urge to the Court that that's not how PIK cites the premeditation instruction.

"THE COURT: It accurately states the law. Actually, I've heard it said that premeditation may arise in the blink of an eye. I feel it's a proper statement of the law."

" 'Jury instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous.' " *State v. Hunt*, 257 Kan. 388, 392, 894 P.2d 178 (1995) (quoting *State v. Walker*, 252 Kan. 279, 295, 895 P.2d 1 [1993]).

We have advised trial courts that PIK language is preferable and absent particular facts requiring modification, the PIK instructions should be followed:

"The use of PIK instructions is not mandatory, but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed. [Citations omitted.]" *State v. Butler*, 257 Kan. 1043, 1066, 897 P.2d 1007 (1995).

The modification of the PIK definition of "premeditation" has arisen several times in Kansas. An examination of recent cases on this issue shows that the facts of each case are essential to the analysis of whether the jury could be misled by the instructions.

In *State v. Martinez*, 223 Kan. 536, 537, 575 P.2d 30 (1978), the trial court modified the PIK definition of deliberate and premeditated, defining premeditation as "thought of beforehand for any length of time sufficient to form an intent to act, however short." The *Martinez* court noted that the record reflected abundant evidence to show deliberation and premeditation. 223 Kan. at 538. The court held: "While we do not approve the supplemental instruction given by the trial court, under the facts presented here no prejudicial error is shown." 223 Kan. at 538.

In *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988), the trial court added the following to PIK Crim. 2d 56.01: "There is no specific time element required to establish premeditation." Again, we stated that we did not approve of the instruction but held that the PIK definition together with the additional phrase on time correctly stated the law. 243 Kan. at 269. The *Patterson* court

concluded that no prejudicial error arose under the facts of the case.

In *State v. Hamons*, 248 Kan. 51, 62, 805 P.2d 6 (1991), the trial court instructed:

> " ' "Deliberately and with premeditation" means to have thought over the matter beforehand. However, to constitute deliberation and premeditation, no particular time need intervene between formation of the intention and the doing of the act. It is sufficient if they actually existed, with a full appreciation of the result likely to follow from the act, at the time the act was committed, however short the time of their existence may have been.' "

*Hamons* held that this premeditation instruction properly stated the law as applied to the facts.

The most recent examination this court had made of this issue is found in *State v. Kingsley*, 252 Kan. 761, 851 P.2d 370 (1993). The trial court instructed, in addition to PIK Crim. 2d 56.04(b), that "[p]remeditation under the law does not require any specific time frame." 252 Kan. at 771. We held that according to *Patterson*, 243 Kan. at 262, the instructions correctly stated the law. *Kingsley*, 252 Kan. at 772.

No Kansas case has dealt with the question whether the addition of the phrase "it may arise in an instant" to the standard PIK premeditation instruction constitutes error. The instruction given by the court in this case to the extent it used PIK language and added the language "[t]here is no particular time period for premeditation" was a correct statement of Kansas law. The added phrase "it may arise in an instant" has never been approved by this court. The defendant argues that this added phrase amounts to the failure to instruct on an essential element and that such error requires reversal. See *State v. Crawford*, 247 Kan. 223, Syl. ¶ 3, 795 P.2d 401 (1990). We disagree.

However, we do agree that the trial court's inclusion in its instruction of premeditation that "it may arise in an instant" was inappropriate. The use of such language in instructing a jury tends to diminish the importance of the element of premeditation. Nevertheless, the court's statement that premeditation means to have thought over the matter beforehand, and that there is no particular time period for premeditation, is a correct statement of Kansas law.

The evidence in this case demonstrated that the victim was hit in the head numerous times, including 18 strikes with a hammer. The physical evidence showed that the victim was likely struck while either a pillow or a jacket was placed over her head. There was no evidence presented to suggest provocation. Further evidence demonstrated that the defendant left the residence telling several people he was going to work but in fact went to Bayliff's home to hide. We have held:

"[T]he element of premeditation is not inferred from use of a deadly weapon alone, but if additional circumstances are shown, such as lack of provocation, the defendant's conduct before and after the killing, or the striking of a lethal blow after the deceased was rendered helpless, the evidence may be sufficient to support an inference of premeditation. [Citations omitted.]" *State v. Sanders*, 258 Kan. 409, 414-15, 904 P.2d 951 (1995).

The record contains abundant evidence to show premeditation and deliberation.

Under the facts of this case, we conclude that the jury was not misled by the trial court's instruction on premeditation and that the instruction given does not constitute reversible error although the addition of the phrase "it may arise in an instant" was inappropriate.

## LESSER INCLUDED OFFENSE INSTRUCTIONS

The defendant argues that the evidence of record required the court to instruct the jury on the lesser included offense of voluntary manslaughter, K.S.A. 21-3403(a). Based upon its evaluation of the evidence presented, the trial court instructed on premeditated first-degree murder, K.S.A. 21-3401(a), and intentional second-degree murder, K.S.A. 21-3402(a). The court concluded that the evidence warranted no other lesser included offense instructions:

"As I have spoken earlier, it's my opinion that . . . there are no other lesser-included offenses in this case, other than the one of second-degree murder. The defendant denies any and all involvement. The only question, then, the jury might have in regards to a lesser would be whether or not there was the existence of premeditation. Therefore, I'm going to give second degree."

The trial court has a statutory duty to instruct the jury on lesser included offenses. K.S.A. 21-3107(3) states:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

The duty arises whether or not the defendant requests the instruction at trial. *State v Sanders*, 258 Kan. 409, 413, 904 P.2d 951 (1995); *State v. Bowman*, 252 Kan. 883, 892, 850 P.2d 236 (1993). Recently, this court restated the standard of review in *State v. Harris*, 259 Kan. 689, 702, 915 P.2d 758 (1996):

"We have held that a criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense."

Voluntary manslaughter is defined in K.S.A. 21-3403(a) as "the intentional killing of a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." Voluntary manslaughter is a lesser included crime of first-degree murder. *Kingsley*, 252 Kan. at 782. However, we have carefully outlined when it is appropriate for a trial court to instruct on voluntary manslaughter for a defendant charged with murder:

" 'In order for a defendant charged with murder to be entitled to a jury instruction on voluntary manslaughter because he acted in the heat of passion, his emotional state of mind must exist at the time of the act and it must have arisen from circumstances constituting sufficient provocation.'

" 'The test of the sufficiency of the provocation is objective, not subjective. The provocation, whether it be "sudden quarrel" or some other form of provocation, must be sufficient to cause an ordinary man [or woman] to lose control of his actions and his reason. In applying the objective standard for measuring the sufficiency of the provocation, the standard precludes consideration of the innate peculiarities of the individual defendant.' " *State v. Bailey*, 256 Kan. 872, 886, 889 P.2d 738 (1995) (quoting *State v. Guebara*, 236 Kan. 791, Syl. ¶¶ 2, 3, 696 P.2d 381 [1985]).

The record in this case contains no evidence of provocation. Absent such evidence, the trial court correctly concluded that the defendant was not entitled to an instruction on the lesser included offense of voluntary manslaughter.

## ADMISSION OF PHOTOGRAPHS

The defendant challenges the admission of several photographs offered by the State as gruesome, repetitive, and prejudicial. Specifically, the defendant objects to three sets of photos: the State's exhibits numbered 27-44, 45-55, and 58-64.

The photographs numbered 27-44, taken by Nancy Lampe, a crime scene investigator for the Wichita Police Department, depict the crime scene, the victim's body as discovered at the scene, and some objects discovered near the body. Photographs numbered 45-55, taken by Patric Cunningham, crime scene investigator for the Wichita Police Department under the direction of coroner Dr. Corrie May, are 8 x 10 full color autopsy photos depicting Swinney's head wounds. Photographs numbered 58-64, also taken by Patric Cunningham under the direction of Dr. May, illustrate the areas of abrasion or contusion to Swinney's body as discovered at the autopsy.

The law in Kansas regarding the admission of photographs in a criminal prosecution is well established. We have said: "Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. Demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue." *State v. Walker*, 252 Kan. 279, 287, 845 P.2d 1 (1993).

Our standard of review is also well established:

"It is recognized that the admission in evidence of photographs of homicide victims must necessarily rest largely in the discretion of the trial judge. In each case, it is the trial judge who determines whether the photographs serve a proper purpose in the jury's enlightenment. His [or her] action will not be disturbed." *State v. Ruebke*, 240 Kan. 493, 516-17, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

The defendant was charged with premeditated first-degree murder. All the photographs objected to consist of true reproductions of relevant physical facts and material conditions at issue. Photographs numbered 27-44 of the crime scene, depicting objects

found near the victim's body and the location of the victim's body at the scene, are relevant and admissible.

Based upon Dr. May's testimony, all the photographic exhibits of the autopsy are relevant and admissible. Dr. May testified specifically regarding exhibits 45-55, expressing her opinion that the photos were not duplicitous:

"[T]he flow of exhibits is to take the observer from left side of the head and then move around the back of the head and then along the right side in that some of the wounds are shown more than one time, however, because it is the head, a curved surface. It's almost impossible to get that sort of view just from three shots to the side. Unfortunately, it's back of the head. So in my view, these photographs logically take the observer from one side of the head around the back and to the other side, so that each individual would can be discussed."

Photographs numbered 58-64 are neither gruesome nor repetitive. Exhibit 58 depicts a bruise over the top of the left shoulder of the victim. Exhibit 59 depicts a bruise on her right upper arm. Exhibit 60 depicts several bruises on her right wrist. Exhibit 61 depicts contusions and an abrasion over the right wrist. Exhibit 62 depicts contusions on her left hand and left forearm. Exhibit 63 depicts an abrasion on her back and portion of the buttocks. Finally, exhibit 64 shows a bruise on her upper leg.

"Photographs are unduly prejudicial and are erroneously admitted when they are unduly repetitious, particularly gruesome, add nothing to the State's case, and bring about a wrong result." *State v. Clark*, 261 Kan. 460, Syl. ¶ 11, 931 P.2d 664 (1997). The photographs admitted in this case were relevant, probative, and true reproductions of relevant physical facts and material conditions at issue. Admission under these circumstances does not establish an abuse of discretion.

## THE HARD 40 SENTENCE

The defendant argues that his hard 40 sentence must be set aside because the trial court considered improper evidence in violation of K.S.A. 21-4635(b) and because the trial court did not designate in writing the statutory aggravating circumstances which it found as required by K.S.A. 21-4635(c). We find no merit in either claim.

At sentencing, the State not only presented evidence of aggravating circumstances made known to defendant prior to sentence but also presented the trial court with police reports detailing the defendant's prior crimes and bad acts. Relying upon the phrase contained in K.S.A. 21-4635(b) that "[o]nly such evidence of aggravating circumstances as the state has made known to the defendant prior to the sentencing shall be admissible," the defendant claims that the evidence of prior crimes was incompetent and inadmissible.

For additional support, the defendant points to K.S.A. 21-4636 and K.S.A. 21-4637, which list the aggravating and mitigating circumstances. He notes that the introduction to the list of aggravating circumstances states: "Aggravating circumstances *shall be limited to* the following . . .," K.S.A. 21-4636, while the introduction to the list of mitigating circumstances states: "Mitigating circumstances shall include, *but are not limited to,* the following." (Emphasis added.) K.S.A. 21-4637. The defendant asserts that the above language illustrates the intent of the legislature that only evidence of the listed aggravating circumstances is relevant in the hard 40 determination.

In *State v. Richardson*, 256 Kan. 69, 883 P.2d 1107 (1994), we addressed a fact pattern remarkably similar to that of the present case. The defendant was convicted of one count of first-degree murder and one count of aggravated robbery. She was sentenced to life without possibility of parole for 40 years. The defendant argued that the State was permitted to introduce irrelevant and prejudicial evidence of her prior crimes at sentencing.

The *Richardson* court closely examined K.S.A. 1993 Supp. 21-4624(3), which contained nearly identical language to the statute at issue in the present case. *Richardson* rejected the defendant's contentions, stating:

"Richardson's contention that evidence of her prior criminal activity is not relevant to any of the aggravating circumstances appears in part to be accurate. However, the legislature authorized the introduction of a broad spectrum of evidence which 'shall include matters relating to any of the aggravating circumstances' but expressly is not limited to matters relating to those circumstances. K.S.A. 1993 Supp. 21-4624(3). In fact, the legislature authorized the introduction

of evidence 'concerning any matter that the court deems relevant to the question of sentence.' " 256 Kan. at 79.

Following *Richardson*, we conclude that issues regarding aggravating and mitigating circumstances make up only one portion of the evidence the trial court may consider when making its determination under K.S.A. 21-4635. The trial court did not err when it considered the defendant's prior conviction and bad acts.

Finally, defendant argues that his hard 40 sentence is void because the trial court failed to list in writing the aggravating circumstances it found at the sentencing hearing. The defendant grounds his argument upon K.S.A. 21-4635(c), which provides in relevant part:

"If the court finds that one or more of the aggravating circumstances enumerated in K.S.A. 21-4636 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced pursuant to K.S.A. 21-4638 [hard 40] and amendments thereto; otherwise, the defendant shall be sentenced as provided by law. *The court shall designate, in writing, the statutory aggravating circumstances which it found.*" (Emphasis added.)

Many times this court has stated that the sentence imposed is the sentence stated by the court on the record at the time sentence is imposed. *State v. Moses*, 227 Kan. 400, 402, 607 P.2d 477 (1980). The journal entry memorializes the sentence actually imposed by the court at the time sentence is imposed. In the present case, the record clearly shows that the trial judge found the requisite aggravating circumstances to support a hard 40 sentence:

"The Court has to proceed to sentencing based upon K.S.A. 21-4635. In that situation, the Court has to weigh the aggravating factors and the mitigating factors and make a determination as to whether or not the aggravating circumstances are outweighed by the mitigating circumstances. I cannot at this time make that conclusion. The evidence adduced at trial indicated that there were approximately twenty-two blows to the head of his victim. At least eighteen of which were inflicted by the head of a claw hammer. In the opinion of this Court, it was especially heinous, atrocious, and a cruel manner of inflicting death upon an individual. This Court's opinion is that the aggravating factors in this case outweigh any mitigating factors."

The court then imposed a prison term of life with 40 years of mandatory imprisonment.

The procedure followed by the trial court in this case was not flawed. The lack of a written statement in the journal entry should be corrected by a nunc pro tunc order, incorporating into the journal entry the findings made on the record by the court at the time sentence was pronounced.

Affirmed and remanded for entry of a nunc pro tunc order.